## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA *ex. rel.*
BRADY MCFARLAND,

                            Case No.: 8:15-CV-01708-SDM-TGW

        Plaintiff,

v.                               **SECOND AMENDED COMPLAINT**


FLORIDA PHARMACY SOLUTIONS,     **JURY TRIAL DEMANDED**
MEDIVERSE LLC, MELONIE KOTCHEY,
and WAYNE WILKERSON,

        Defendants.
_____

      This action is brought on behalf of the United States of America by Brady McFarland ("**McFarland**") pursuant to the *qui tam* provisions of the civil False Claims Act ("**FCA**"), 31 U.S.C. § 3729 *et seq.*

### SUMMARY OF THE ACTION

      1.     The federally-funded TRICARE program provides healthcare insurance to the United States armed forces, including active-duty service members, retired service members, and their dependents.

      2.     TRICARE, on behalf of its beneficiaries, spends tens of billions of dollars per year on healthcare reimbursements to healthcare providers. For the majority of healthcare providers who provide medical care to service members and their families, the TRICARE program presents an opportunity to touch and improve the lives of the men and women who selflessly serve their country. Unfortunately, however, given the magnitude of these healthcare expenditures, some unscrupulous healthcare providers and healthcare marketers have discovered ways to line their

pockets with TRICARE reimbursements made possible only through the payment and receipt of unlawful kickbacks.

3.      This case involves one of those instances. Defendant Florida Pharmacy Solutions ("**FPS**") was entrusted by TRICARE to provide prescription healthcare products to TRICARE beneficiaries in exchange for reimbursement by TRICARE.

4.      But FPS abused this trust. FPS sought to maximize the number and amount of the TRICARE reimbursements it received by paying unlawful kickbacks to Defendants Mediverse, LLC ("**Mediverse**"), Wayne Wilkerson ("**Wilkerson**"), and Melonie Kotchey ("**Kotchey**"), in exchange for their funneling of TRICARE-covered prescriptions to FPS.

5.      As a result of these unlawful kickbacks, Defendants presented thousands of false claims for reimbursement to TRICARE. Through these false claims, Defendants ultimately bilked TRICARE of tens of millions of dollars.

6.      FPS is a mail-order, Tampa-based compounding pharmacy that specializes in providing prescription pain creams, scar creams, and wellness capsules to patients nationwide, among other products.

7.      "Compounding" refers to the process of mixing a personalized medication for a patient that is based on a specific, doctor-prescribed formula and ratio of active ingredients.

8.      But FPS's compounded pain creams, scar creams, and wellness capsules were nothing more than souped-up, over-the-counter medications cloaked in the guise of "compounding" in order to allow FPS to seek exorbitant reimbursements from TRICARE.

9.      In 2014, FPS discovered that a billing loophole in TRICARE's system permitted compounding pharmacies such as FPS to seek reimbursement from TRICARE on a per ingredient

basis, resulting in reimbursements of tens of thousands of dollars per TRICARE-covered compounded prescription.

10.     TRICARE quickly became FPS's largest customer. During 2014 and the first half of 2015, FPS filled thousands of pain cream, scar cream, and wellness capsule prescriptions for TRICARE beneficiaries, and sought and obtained reimbursement from TRICARE for these prescriptions.

11.     In turn, FPS's revenues and net profits grew exponentially.

12.     For example, whereas FPS only earned $4.3 million in total revenues during 2013, the pharmacy earned $20.6 million in revenues during 2014, and *another $36 million in revenues during only the first six months of 2015*.

13.     FPS's unbalanced concentration of TRICARE-covered prescriptions was made possible by Defendants Mediverse, Wilkerson, and Kotchey, marketing representatives specializing in the nationwide sale of compounded pain creams, scar creams, and wellness capsules.

14.     Mediverse, Wilkerson, and Kotchey used cold calling, data mining, and other marketing tactics to identify TRICARE beneficiaries located across the country.

15.     Next, for no charge to the TRICARE beneficiaries, Mediverse, Wilkerson, and Kotchey put the beneficiaries in contact with doctors who were willing to simply rubber-stamp FPS-branded, compounding pharmacy prescriptions.

16.     These doctors lacked a bona fide doctor-patient relationship with the TRICARE beneficiaries. Indeed, the consultations arranged by Mediverse, Wilkerson, and Kotchey occurred over the telephone and without any in-person contact between the doctor and the TRICARE beneficiary, often in violation of state licensing regulations.

17.     Mediverse, Wilkerson, and Kotchey funneled any doctor-signed prescriptions that resulted from these cursory consultations to FPS for filling and shipping to the TRICARE beneficiary.

18.     In exchange for the valuable, TRICARE-covered prescriptions, FPS paid Mediverse, Wilkerson, and Kotchey substantial remuneration in amounts directly tied to the reimbursements that FPS received from TRICARE. The greater the TRICARE reimbursement, the greater the kickback to the marketer.

19.     Between September 2014 and June 2015—the core time period of Defendants' scheme to defraud TRICARE—***FPS paid over $16.5 million in unlawful kickbacks to Mediverse, Wilkerson, and Kotchey*** in exchange for their funneling of TRICARE-covered prescriptions to FPS.

20.     FPS calculated these kickbacks on a per prescription basis, aggregated the kickbacks, and then made lump sum payments to Mediverse, Wilkerson, and Kotchey on a periodic basis, often once per week.

21.     For example, on June 3, 2015, FPS wrote three separate checks to Mediverse in the amounts of $1,001,210.56, $500,000.00, and $500,000.00. Twelve days later, FPS electronically wired another $4,940,136.53 to Mediverse in a single payment.

22.     In its accounting records, FPS listed "Commissions" as a description for these transactions. But make no mistake, these "commissions" were unlawful kickbacks that violated the Anti-Kickback Statute ("**AKS**"), 42 U.S.C. § 1320a-7b(b)(1), and as a result also violated the FCA, 31 U.S.C. § 3729(a)(1)(A).

23.     The prescriptions funneled to FPS by Mediverse, Wilkerson, and Kotchey were all tainted by unlawful kickbacks. Indeed, it was only through the illegal kickback scheme that FPS

could get TRICARE beneficiaries located across the country into its mail-order operation, and collect the attendant, high-dollar reimbursements from TRICARE.

24.     Accordingly, McFarland brings this action as a relator on behalf of the United States, and seeks FCA damages and civil penalties jointly and severally against the Defendants.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

26.     This Court has personal jurisdiction over each named Defendant because, *inter alia*, the Defendants transacted business in this District; reside in this District; engaged in wrongdoing in this District; and/or caused the submission of false or fraudulent claims in this District.

27.     31 U.S.C. § 3732(a) further provides for nationwide service of process in this action.

28.     Each Defendant has engaged in significant contacts with the United States, and there is no extraordinary inconvenience to any Defendant to litigating this action in this District, where FPS is located.

29.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c). A substantial portion of the events complained of and giving rise to McFarland's claims occurred in this District in violation of 31 U.S.C. § 3729 and § 3730.

30.     There has been no public disclosure of the allegations herein. To the extent that there has been a prior public disclosure, McFarland is the "original source" under 31 U.S.C. § 3730(e)(4), as he has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions, and he voluntarily provided the information to the Government before filing the original complaint in this action. *See* 31 U.S.C. § 3730(e)(4).

## PARTIES

31.    Plaintiff-Relator Brady McFarland is a former regional marketing and sales representative for FPS. He is a resident of Phoenix, Arizona.

32.    Defendant FPS is a Florida corporation. It is a for-profit, privately-owned compounding pharmacy that ships its products nationwide. FPS's office is located at 3844 5th Avenue, Zephyrhills, Florida 33542.

33.    Defendant Mediverse is a Florida limited liability company. It is a marketing company that specializes in the nationwide sale of compounded treatments. Mediverse funneled TRICARE-covered prescriptions to FPS in exchange for kickbacks from FPS. Its current principal place of business is 420 Churchwell Dr. #19739, Panama City Beach, Florida 32407. Chris White is Owner and Chief Executive Officer of Mediverse.

34.    Defendant Melonie Kotchey is a marketing and sales representative who specializes in the nationwide sale of compounded treatments. Kotchey resides at 27 Ann Street, Pittsburgh, Pennsylvania 15223. Kotchey serves as Chief Executive Officer of Treasure Health LLC ("**Treasure Health**"), a Pennsylvania marketing company that specializes in the nationwide sale of compounded treatments. Kotchey funneled TRICARE-covered prescriptions to FPS in exchange for kickbacks from FPS.

35.    Defendant Wayne Wilkerson is a marketing and sales representative who specializes in the nationwide sale of compounded treatments. Wilkerson resides at 8622 Rosada Drive, Ooltewah, Tennessee 37363. Wilkerson is the owner of Top Tier Medical, LLC ("**Top Tier Medical**"), a Tennessee marketing company that specializes in the nationwide sale of compounded treatments, with a principal office at 5959 Shallowford Road, Suite 103, Chattanooga, Tennessee 37421, and a mailing address of 8622 Rosada Drive, Ooltewah, Tennessee 37363 (Wilkerson's

home address). Wilkerson is also the owner of Karma Wellness Spa, a facility that provides aesthetic and medical treatments and that employs doctors and nurse practitioners who practice telemedicine. Karma Wellness Spa's physical address is 5959 Shallowford Road, Suite 103, Chattanooga, Tennessee 37421 (the same office address as Top Tier Medical). Wilkerson funneled TRICARE-covered prescriptions to FPS in exchange for kickbacks from FPS.

## STATEMENT OF FACTS

**A.      The TRICARE Program**

36.      TRICARE is a federally funded medical benefit program established by statute. *See* 10 U.S.C. §§ 1071-1110. Housed within the Department of Defense ("**DOD**"), TRICARE provides healthcare benefits to eligible beneficiaries who are active duty service members, retired service members, and their dependents.

37.      For purposes of the AKS, TRICARE qualifies as a "Federal health care program," since it is a "plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government." 42 U.S.C. § 1320a-7b(f).

38.      As part of its pharmacy and medical benefits, TRICARE reimburses pharmacies for compounded drugs. The Defense Health Agency, Express Scripts (the DOD's pharmacy benefits manager), and the DOD's managed care support contractors and their subcontractors collectively manage TRICARE's pharmacy and medical benefits. They also manage the processing of pharmacy and medical claims from civilian pharmacy, outpatient, and inpatient providers. Express Scripts, in particular, contracts with retail pharmacies, negotiates rebates with drug manufacturers and discounts with retail pharmacies, and processes and pays prescription drug claims.

39.     TRICARE covers all FDA-approved products that make up a compounded drug. *See* 32 C.F.R. §§ 199.2, 199.4(g)(15)(i)(A). TRICARE reimburses pharmacies for each ingredient in a compounded drug at the average wholesale price minus a negotiated discount for compounded drug prescriptions dispensed at retail pharmacies. The total cost of a compounded drug prescription consists of the cost of the individual drug ingredients, a dispensing fee, and an additional fee for the pharmacist's effort to compound the drug.

40.     Compliance with the AKS is a condition of payment under the TRICARE program.

41.     Between October 1, 2014, and April 30, 2015, TRICARE paid approximately $1.5 billion in claims for compounded drugs. With TRICARE's costs ballooning, TRICARE implemented new controls in May 2015 to screen compounded ingredients and reduce TRICARE's costs.

**B.    FPS's Compounded Products**

42.     FPS is a full-service compounding pharmacy.

43.     "Compounding" refers to the process of mixing a personalized medication for a patient that is based on a specific, doctor-prescribed formula and ratio of active ingredients.

44.     FPS specializes in compounded pain and scar creams. These are the treatments at-issue in this FCA action, along with compounded "wellness capsules," which are merely vitamins with a fancy name.

45.     These compounded treatments contain essentially the same components as over-the-counter medications and vitamins. For example, FPS's "scar kits" consist of two constituent creams, each of which contains the same active ingredients as Pracasil Plus Gel, an over-the-counter drug.

46.     However, by providing the scar cream to a patient as a prescribed, compounded cream, and by adding additional, unnecessary ingredients, FPS could maximize its ability to bill insurers, such as TRICARE, for patients' treatments and to maximize the amount insurers such as TRICARE would pay for any single prescription.

47.     Because of TRICARE's billing loophole that paid on a per ingredient basis without a maximum cost per prescription, FPS was effectively able to turn over-the-counter topical creams and vitamins into winning lottery tickets.

48.     Thus, for any given TRICARE beneficiary, FPS sought and received reimbursement from TRICARE of up to $45,000 for a set of compounded scar creams, up to $18,000 for a pack of wellness capsules, and up to $15,000 for a single compounded pain cream.

49.     Recognizing these staggering rates of reimbursement, FPS regularly encouraged its sales representatives, including McFarland, to focus on ways to increase scar cream, pain cream, and wellness capsule prescriptions.

50.     Moreover, FPS and its marketing representatives—including Mediverse, Wilkerson, and Kotchey—encouraged doctors to prescribe multiple prescriptions from the same patient during a single consultation. Thus, it was common for FPS to fill pain cream, scar cream, and wellness capsule prescriptions at the same time for a single patient, and to seek reimbursement from TRICARE for each product.

51.     Prescribing more than one prescription per patient was made particularly easy through FPS's use of pre-printed prescription pads. These pads contained, on a single page, every compounded prescription offered by FPS. Thus, a prescriber could quickly prescribe multiple products simply by checking multiple boxes on the prescription pad. Exhibit A is an example of a blank FPS prescription pad.

52.     FPS encouraged the writing of multiple prescriptions per patient. For example, FPS's sales and marketing manager, Jessica Pent ("**Pent**"), reminded the FPS salesforce in a January 20, 2015 email that any doctor writing a prescription for a pain cream should also be asked to write a prescription for wellness capsules, which were reimbursed by TRICARE at wild rates: "REMEMBER – Your providers should be writing for the 'Wellness Capsule' located in the bottom block of the script pad (last item listed) *when they write for any pain cream. These have great reimbursement rates*."

53.     And, through doctor-signed Blanket Letters of Authorization ("**BLOAs**"), FPS could substitute constituent ingredients into prescribed treatments in order to ensure that a particular prescription was reimbursed at the highest possible amount by TRICARE. (BLOAs are described in greater detail below.)

54.     As TRICARE's reimbursement rates and policies changed over the course of September 2014 to June 2015, FPS staff regularly substituted ingredients into prescribed treatments in order to maximize the total amount drained from TRICARE.

55.     Not only that, but because FPS permitted "auto refills" and encouraged doctors to authorize the maximum amount of refills possible, these amounts could be collected from TRICARE over and over for a single patient, without FPS or the doctor ever re-contacting the patient following the initial, telephonic consultation.

56.     And because FPS provided its products by mail, many TRICARE beneficiaries continued to receive refills—at a major cost to TRICARE—even though they found the product ineffective or no longer used it.

C.      **McFarland's Role at FPS**

57.     McFarland began working as a regional marketing and sales representative for FPS in August 2013. McFarland was tasked by FPS with increasing its market share in Arizona.

58.     In connection with this role, FPS provided McFarland with an official company email address, FPS prescription pads, FPS sales materials, and access to FPS's integrated, online sales platform, "FPSTrack."

59.     As compensation, FPS paid McFarland a 25% commission each time FPS filled a prescription written by a doctor to whom Mr. McFarland had marketed FPS's products.

60.     In October 2013, McFarland traveled to FPS's office and laboratory in Tampa, Florida. There, he met with FPS's owners, including Wes Moss, as well FPS's general manager, pharmacist-in-charge, billing manager, and sales manager.

61.     McFarland attended a dinner with FPS's general manager, who provided an overview of the pharmacy's work flow, including marketing and sales, FPS's receipt of prescriptions, the compounding process, shipment to patients, and insurance reimbursements.

62.     During the trip, McFarland also participated in two days of training in which he shadowed FPS sales representatives based in Florida as they made sales visits to doctors.

63.     Following his trip to Tampa, McFarland returned to Arizona, where he spent 2014 working as an FPS marketing representative in an effort to increase FPS's market share there.

64.     Even though he was an experienced FPS sales representative, FPS required every member of its salesforce, including McFarland, to view a January 2015 training presentation.

65.     During the five-hour presentation, FPS emphasized its sales techniques and insurance-reimbursement model.

66.     One slide listed average insurance pay-outs for each of FPS's products, organized from highest pay-out to lowest, with a background image showing $100 bills. According to the FPS trainer's remarks during the presentation, the money "speaks for itself."

67.     Another slide listed the insurance carriers that FPS accepted, with TRICARE listed prominently at the top of the list.

68.     Also in January 2015, Pent (FPS's sales and marketing manager) announced to the salesforce that there would be a company-wide meeting on January 30, 2015, during which FPS would unveil "upcoming changes/expectations for the new year."

69.     During the January 30 conference call, FPS's owners announced that FPS was expanding into telemedicine consultations between doctors and patients as a way to increase its volume of compounded prescription sales, and that it had added a new sales team—staffed by Mediverse—at its home office in Tampa to manage the increased prescription volume.

70.     Consistent with this new initiative, FPS began copying an official Mediverse email address on its correspondence with the FPS salesforce.

71.     Following the January 30 conference call, McFarland reached out to the Mediverse representative who participated in the call to discuss potential marketing strategies that McFarland could employ in Arizona. The Mediverse representative recommended that McFarland focus his sales efforts at doctors' offices near military bases, since patients visiting these offices were often covered by TRICARE health insurance, which, according to the Mediverse representative, would cover prescriptions at high-paying rates and lead to substantial commissions for McFarland.

72.     Around the same time, FPS also added a staff of billing subcontractors managed by non-party Helix Management ("**Helix**"). Like Mediverse, Helix is owned by Chris White.

73. Helix billers worked out of FPS's Tampa office and were the primary FPS representatives coding TRICARE-covered prescriptions and raising any TRICARE coding or billing issues to TRICARE.

74. With the Mediverse marketers and Helix billers in place, FPS ultimately staffed over 50 individuals at its Tampa-area offices, as reflected in Exhibit B, FPS's staff directory. The majority of these individuals were tasked with sales and billing responsibilities.

**D.  McFarland's Discovery of Defendants' Fraudulent Scheme**

75. In early 2015, McFarland began to question the FPS business model. From his perspective, it made little sense that a single prescription for a topical scar or pain cream could be reimbursed by any insurer for tens of thousands of dollars.

76. Ultimately, McFarland uncovered a highly profitable scheme by Defendants to defraud TRICARE of tens of millions of dollars in reimbursements. This action focuses on the marketing schemes perpetrated by three marketing Defendants—Wilkerson, Mediverse, and Kotchey—and the unlawful kickbacks that flowed between FPS and these Defendants between the fall of 2014 and June of 2015.

**1.  FPS/Wilkerson**

77. McFarland first uncovered Wilkerson's fraudulent marketing practices upon a review of a detailed FPS sales report that FPS accidentally shared with McFarland, and a subsequent, in-depth review of prescription records maintained in FPS's online sales platform, FPSTrack.

*a.  The Sales Report*

78. In early 2015, McFarland became concerned about FPS's business model based on his conversations with FPS's owners and sales managers, his conversation with the Mediverse

representative referencing TRICARE and telemedicine, and FPS's marketing push that began in January 2015.

79.     Following a search of his emails for documents that might support his concerns, McFarland discovered a November 2014 sales report that only added to his questions.

80.     Throughout his time with FPS, McFarland received weekly sales reports that showed the number of prescriptions attributable to his marketing activities.

81.     In November 2014, an FPS sales manager in Tampa inadvertently sent McFarland an Excel sales report that showed sales activities by other sales representatives for a one-week period, and not just McFarland's personal results, as had been FPS's customary practice.

82.     The report lists prescriptions filled by FPS and billed to insurers between November 3, 2014 and November 7, 2014, and reflects all material information for any given prescription listed in the report, including prescription number, the date the prescription was filled by FPS, the date the prescription was written by a doctor, patient name and birth date, the formula for the prescribed treatment, doctor name, doctor location, the insurer, the amount reimbursed by the insurer, the designated sales representative, and the number of refills remaining.

83.     On balance, the report shows that certain FPS marketing representatives were receiving credit for dozens of expensive prescriptions per week, each written by the same doctors, and as a result, these marketing representatives were receiving hundreds of thousands of dollars in commissions.

84.     The report also reflects that TRICARE was serving as the insurer for a disproportionate number of the prescriptions attributed to certain FPS marketing representatives.

85.     Most noteworthy, the report reflects that Wilkerson was the assigned sales representative for *65 prescriptions reimbursed by TRICARE during the five-day period* covered

by the report, far more TRICARE-covered prescriptions than any other FPS sales representative listed. TRICARE reimbursed FPS a total of $707,196 for these prescriptions (an average of $10,880 per prescription).

86.     Based on his review of the sales report, McFarland's concerns escalated. McFarland next dove deeper into FPS's fraudulent web.

*b.*     *FPSTrack*

87.     As an FPS representative, McFarland had access to "FPSTrack," an online sales platform in which FPS organized and tracked prescriptions. McFarland could enter FPSTrack by logging on with his FPS email address and password. Exhibit C shows the sign-in page for FPSTrack.

88.     Actors at every step of the prescription filling process—from FPS marketing representatives such as McFarland, to FPS pharmacists, to FPS billers, to FPS shippers—all used FPSTrack on a daily basis to update and track prescriptions in real-time.

89.     FPSTrack also served as FPS's primary billing software.

90.     As part of his job responsibilities, McFarland could log into FPSTrack to monitor prescriptions written by doctors to whom he had marketed FPS's products.

91.     Indeed, FPS specifically trained McFarland on how to use FPSTrack.

92.     In an August 2014 email, for example, Pent urged FPS's salesforce, including McFarland, to always log into FPSTrack before contacting the FPS home office with any questions about a particular prescription or payment: "Please remember that ***FPS Track is a highly useful tool***, that the company pays for to assist you in the field. Remember you should be looking in FPS Track yourself first, before calling the pharmacy. If after reading all of the notes associated with

the script in question, you are still in the 'dark' on why something wasn't filled, etc….please feel free to call me at the office."

93.     For any given prescription, FPSTrack lists the following fields, among others: patient initials, birth date, and phone number, prescriber name, prescriber fax number, drug formula prescribed, amount of product dispensed, barcode, prescription number, co-payment amount, payor (*i.e.*, insurer name, such as TRICARE), the adjusted amount actually paid by the payor, sales representative, distributor, and order status (*e.g.*, that the order has been closed and shipped).

94.     Exhibit D is an example of the FPSTrack output for a TRICARE-covered, Wilkerson-associated prescription. Although he lost access to FPSTrack sometime after his employment with FPS ended in 2015, McFarland has preserved records of the prescriptions he reviewed in connection with bringing this *qui tam* action and maintains possession of such records. Exhibit D is merely one such example of the FPSTrack output for the prescriptions at issue in this action.

95.     Notably, the "Adj Amt" (adjusted amount) field lists the reimbursement paid by the "Payor" (listed as TRICARE) for the scar cream prescription ($14,358.21), and the "Status" field lists "Closed (Order Shipped)." For each of the prescriptions at-issue in this action, FPS made an actual claim for reimbursement from TRICARE for a shipped prescription, and TRICARE reimbursed the amount listed in FPSTrack.

96.     Where TRICARE did not reimburse FPS for a particular prescription (such as where a TRICARE beneficiary refused to provide information or to accept a mailed order), FPSTrack does not include any payment data in the "Adj Amt" field, and does not list the order status as closed and shipped in the "Status" field.

97.     FPSTrack also contains an "Order History" field in the lower-left corner of the output page for each prescription, in which FPS staff members, including billers, working at the Tampa office could annotate the file to reflect, among other things, that a prescription was received from a doctor, that a pharmacist review was in progress, or that an order had shipped. When viewing FPSTrack records online, a user could scroll through these Order History comments, reviewing them in reverse chronological order.

98.     These notations were often made using pre-populated language to reflect ordinary updates, such as "The RX has been received at the desk of [name of FPS biller]," "Order shipped," or an entry indicating the UPS tracking number for the shipment. Exhibit D reflects certain of these notations, such as changes to the order status and the shipping number.

99.     But FPS staff members could also make unique notations reflecting additional order status details, patient issues, or describing their conversations with TRICARE representatives, which occurred regularly.

100.    Indeed, FPS billers often added notations confirming their conversations with TRICARE representatives, in which the billers sought and received case-specific overrides in order to bill a particular formula to TRICARE.

101.    For example, in an FPSTrack listing for a TRICARE-covered prescription associated with Kotchey, the FPS biller noted the following: "Claim rejection for cost exceeds max. Spoke w/ Mary at insurance help desk (4/10/15 @ 6:48PM) and she provided me w/ override and case ID #28250613."

102.    These conversations between FPS billers and TRICARE representatives were common, and resulted in TRICARE granting an override that allowed FPS to bill the full cost of the particular prescription to TRICARE, notwithstanding the $1,000 cap that often applied to

individual prescriptions the first time that FPS attempted to bill to TRICARE. For many prescriptions, however, the conversation was not necessary, and FPS could simply bill the full amount to TRICARE as a matter of course.

103.    In addition to the data shown on the FPSTrack page, full PDF copies of documents associated with any particular prescription were available through links located on the FPSTrack page. Thus, users like McFarland could click to open an actual prescription signed by the prescribing doctor, as well as other documents associated with the prescription, including materials used in connection with telemedicine consultations, and doctor-signed BLOAs.

104.    Ultimately, McFarland discovered that he could access the prescriptions listed on the sales report as associated with Wilkerson in FPSTrack by manually typing in the prescription numbers into the search field.

105.    McFarland entered the prescription numbers for the TRICARE-covered prescriptions listed in the sales report associated with Wilkerson, and discovered that the prescriptions all appeared to be associated with telemedicine consultations, and were all reimbursed by TRICARE at staggering rates.

106.    For example, Exhibit D is the FPSTrack output and associated documents for scar cream prescription number 126880, listed in the November sales report as associated with Wilkerson and a prescribing doctor named Susy Vergot.

107.    When McFarland opened the FPSTrack page for prescription number 126880 and the associated documents, he discovered that the TRICARE beneficiary's delivery address was listed as a shipping address in Norfolk, Virginia, an area with a major military presence. The physical prescription (which could be opened by clicking a link on the FPSTrack page for the prescription and is also included in Exhibit D) also reflected that Dr. Vergot was located at 5959

Shallowford Road, Suite 103, Chattanooga, TN—the same address as Wilkerson's Karma Wellness Spa and the same address listed for Wilkerson's marketing company, Top Tier Medical.

108.   Also included at the end of Exhibit D is a separate, full-text document associated with the FPSTrack record that included the TRICARE beneficiary's full insurance information.

109.   Like the sales report, the FPSTrack page listed TRICARE as the "Payor" and Wilkerson as the "Sales Rep." FPSTrack also listed the "Adj Amt" (adjusted amount) for the prescription at $14,358.21—the same amount listed as the "insurance paid" amount in the sales report. The data matched.

110.   Upon a review of additional Wilkerson prescriptions listed in the sales report, McFarland discovered that the TRICARE beneficiaries receiving the prescriptions were almost all located around Norfolk, Virginia and Clarksville, Tennessee, each locations with a major military presence and a high saturation of TRICARE beneficiaries. (Although in Tennessee, Clarksville is over 190 miles from Karma Wellness Spa's location in Chattanooga, on the other side of the state).

111.   McFarland further discovered notations in FPSTrack for the three prescribers associated with Wilkerson's prescriptions—Candace Craven, Toni Dobson, and Susy Vergot—reflecting that they each began submitting prescriptions to FPS in August 2014, and that each appeared to be working out of Wilkerson's Karma Wellness Spa in Chattanooga.

112.   McFarland also discovered notations in FPSTrack indicating that each of Wilkerson's prescribers had signed a BLOA authorizing FPS to substitute ingredients and to change formulas in order to maximize TRICARE reimbursements.

113.   The FPSTrack page for each of the prescriptions listed Wilkerson in the "Sales rep." field.

114.    From his own experience as an FPS sales representative, McFarland understood that the person listed in the "Sales Rep." field was the one who received any commission associated with the prescription. Because the volume of FPS prescriptions tied to McFarland's sales in Arizona was low, McFarland's FPS compensation was always modest.

115.    However, based on the sheer number of TRICARE-covered prescriptions associated with Wilkerson in the sales report and FPSTrack, McFarland recognized that Wilkerson was receiving massive payments from FPS.

116.    Indeed, as described in greater detail below, Wilkerson in fact received substantial and unlawful kickbacks for each of these prescriptions. Between November 1, 2014 and December 2, 2014 (the month following the prescriptions referenced in the sales report), FPS paid Wilkerson $1,048,251 in kickbacks in exchange for funneling TRICARE-covered prescriptions to FPS.

117.    In total, beginning in September 2014 (the month after Wilkerson's three Karma Wellness Spa prescribers first appeared in FPSTrack) and June 2015, FPS paid Wilkerson a total of $3.5 million in unlawful kickbacks tied to the TRICARE-covered prescriptions.

### 2.    FPS/Mediverse

118.    Next, McFarland began entering novel, six-digit prescription numbers into FPSTrack, recognizing that FPS assigned predictable and cumulative (*i.e.*, non-random) numbers to its prescriptions. As a regional marketing and sales representative, McFarland had full access to these FPSTrack records.

119.    Through these manual searches, McFarland discovered that Mediverse was associated with thousands of TRICARE-covered prescriptions. Like the Wilkerson-associated prescriptions, McFarland has preserved and retained copies of these FPSTrack records and associated documents.

120.    As with the Wilkerson-associated prescriptions, the FPSTrack records for the Mediverse-associated prescriptions indicate that TRICARE actually reimbursed FPS for the products, and that the orders were closed and shipped.

121.    Each of these FPSTrack pages for the Mediverse-associated prescriptions lists "Doctor T T Doctor" in the "Sales Rep." field. FPS used "Doctor T T Doctor" to refer to all Mediverse-associated sales and commissions.

122.    As referenced above, FPS began referring its salesforce, including McFarland, to Mediverse in January 2015. In an email that same month, Pent vaguely informed its salesforce that Mediverse would be "consulting with FPS" as its in-house sales team.

123.    Mediverse describes itself as "a nationwide, innovative medical distributor that specializes in compounding pharmacy sales and state-of-the-art pharmacogenetic services." The company's marketing materials explain that "[a]t Mediverse, our goal is to link representatives with ground breaking technology in medicine and science." Among other fields, Mediverse describes itself as an "Industry Leader" in telemedicine. On the company's LinkedIn page, Mediverse continues to seek "current or past . . . compounding Reps" to aid its sales, and ***openly promises "higher adjudications and higher than industry standard commission structures***."

124.    Mediverse is owned by Chris White. Beginning in late 2014, White and his Mediverse team joined FPS as its in-house marketing team (his team of Helix billing subcontractors joined at the same time).

125.    Like Wilkerson, Mediverse received a kickback for each TRICARE-covered prescription that Mediverse funneled to FPS.

126.    Mediverse's staff of marketers used cold calling and data mining methods to identify TRICARE beneficiaries. Mediverse also purchased TRICARE beneficiary leads from other third-party marketing companies located throughout the country.

127.    Once a TRICARE beneficiary was identified, a Mediverse representative gathered information from the patient, including insurance information, contact information, and a brief medical history. Mediverse listed all of this information on a document entitled "Topical Compounded Therapy," attached as Exhibit E.

128.    On the top-right corner of each Topical Compounded Therapy questionnaire, Mediverse first listed its own name to ensure that a commission would be paid to Mediverse should FPS ultimately fill a prescription and obtain reimbursement from TRICARE.

129.    The beneficiary's insurance coverage was also prominently displayed in the top-right corner of the questionnaire.

130.    None of the Topical Compounded Therapy questionnaires that McFarland uncovered and retained through his manual searches identifies any insurer other than TRICARE. In other words, Mediverse was specifically targeting TRICARE beneficiaries due to TRICARE's high reimbursement rates and the attendant kickbacks that Mediverse received from FPS for each TRICARE-covered prescription.

131.    Beneficiaries were asked to list any prescription or over-the-counter medicines they were currently taking, any allergies, and any prior surgeries.

132.    Next, the Mediverse representative walked the TRICARE beneficiary through the following buckets of "medical conditions," soliciting information from the beneficiary for each type of condition: inflammatory pain, neuropathic pain, "combination pain," other pain, wounds, scars, neurology, nausea, dermatology, specialty dermatology, and wellness/metabolic.

133.     Uncoincidentally, these buckets of medical conditions follow the same exact order as the various medical conditions included on FPS's stock prescription pad.

134.     In a "Special Notes" field at the end of the document, the Mediverse representative—who was not a medical professional, such as a doctor or a nurse—made specific product recommendations to the doctor who would eventually consult on the case and sign any prescriptions. In Exhibit E, for example, the representative recommended: "WELLNESS CAPS diabetic, SCAR COMPLETE knee, COMBO PAIN CREAM for arthritis and neuropathy, FUNGUS CREAM for toes."

135.     Although recommendations for scar creams, pain creams, and wellness capsules were the most common, Mediverse's marketing staff often recommended even more products. For patient B.W., for example, Mediverse recommended seven different products. Sure enough, the doctor who consulted patient B.W. *checked-off seven separate, "recommended" prescriptions* on a single FPS prescription pad (two pain creams, a nausea cream, an eczema cream, hair loss cream, a shingles cream, and wellness capsules).

136.     The TRICARE beneficiaries identified by Mediverse were located throughout the country.

137.     To make doctor consultations as effortless for the beneficiaries as possible, Mediverse contracted with 1stCareMD, a medical staffing agency that matched TRICARE beneficiaries identified by Mediverse with 1stCareMD doctors. In other words, instead of using its own staff doctors, as Wilkerson did through Karma Wellness Spa's doctors and nurse practitioners, Mediverse used a middle man agency that specialized in providing telemedicine services.

138.     Armed with the information contained in Mediverse's Topical Compounding Therapy questionnaire, 1stCareMD's streamlined telemedicine platform, and FPS's stock

prescription pad, these 1stCareMD doctors performed perfunctory teleconsultations in which they spoke to the TRICARE beneficiaries for a brief period, typically around fifteen minutes, in order to "confirm" purported the medical necessity of the recommended prescriptions.

139.     In addition to listing recommended products, Mediverse also used the "Special Notes" field of the Topical Compounding Therapy questionnaire to communicate with these consulting doctors in order to increase the likelihood that the doctor could reach the TRICARE beneficiary and that the TRICARE beneficiary remembered that he or she had spoken to a marketing representative and was willing to move forward with a prescription during a subsequent phone call with a doctor.

140.     For example, in connection with an April 2015 prescription funneled by Mediverse to FPS, the Mediverse representative reminded the consulting doctor to "***make sure to mention rep's name, Marchel, during follow up call to jog her memory***." The consulting doctor did, in fact, perform a teleconsultation and signed a wellness capsule prescription, which TRICARE reimbursed to FPS for $17,778.82.

141.     Other Mediverse questionnaires noted ideal times to call the patient, such as after work hours.

142.     Following completed teleconsultations, the 1stCareMD doctors signed prescriptions on FPS prescription pads—often multiple products per patient, as recommended by the Mediverse representative on the Topical Compounding Therapy questionnaire—and per Mediverse's instructions, delivered the signed prescriptions to FPS.

143.     In most cases, the 1stCareMD doctors simply rubber-stamped prescriptions for the "Recommended Products" included in the Special Notes field of the Topical Compounding Therapy questionnaire.

144.    Mediverse also ensured that the consulting doctors signed BLOAs that authorized FPS to make substitutions of prescribed compounded formulas without seeking specific approval from the prescribing doctor.

145.    Certain of these BLOAs were drafted on 1stCareMD's letterhead, whereas others were drafted on Mediverse letterhead, which, at the bottom, specifically listed FPS as within the "Mediverse Network of Pharmacies." Otherwise, the language of the BLOAs was identical whether on 1stCareMD letterhead or Mediverse letterhead. Exhibit F contains example BLOAs on 1stCareMD and Mediverse letterhead.

146.    Mediverse's marketing strategy ultimately lead to the submission of thousands of TRICARE-covered prescriptions to FPS.

147.    As described in more detail below, Mediverse received substantial and unlawful kickbacks for each of the prescriptions it funneled to FPS. These payments began to trickling in from FPS in November 2014, but ballooned in January 2015, the same period in which FPS first announced that Mediverse would be joining the FPS team.

148.    In total, between November 2014 and June 2015, *FPS paid Mediverse $12.3 million in unlawful kickbacks* tied to the TRICARE-covered prescriptions. FPS paid almost this entire amount—$12.15 million—in the six months between January 2015 and June 2015.

149.    With the money flowing in from TRICARE, FPS was willing to ignore the many red flags raised by Mediverse's dubious marketing tactics.

150.    Below, McFarland provides some of the more questionable notations that he discovered during a review of Mediverse-associated, TRICARE-covered prescriptions in FPSTrack. These are merely examples of the many FPSTrack notations that McFarland has in his possession.

151.    In March 2015, Mediverse funneled to FPS a TRICARE-covered prescription for R.S. signed by Dr. Jason Beck. TRICARE rejected the claim because the beneficiary's coverage had expired. An FPS biller then made the following notation in the Order History field on FPSTrack: "called pt [patient] and his wife [] answered, *she stated that pt has dementia and does not understand what's going on.* I asked her about ins[urance] info and she said that the pt gets all his medication from the va [veterans administration] and *they had no idea who Dr. Beck was or what this medication was for.*"

152.    The next month, Mediverse funneled to FPS another TRICARE-covered prescription signed by Dr. Beck, this time for G.L. An FPS biller made the following notation in the Order History field on FPSTrack regarding her conversation with the patient: "pt [patient] called in returning a phone call. He said he *had no idea what this RX is for or where it came from. He did not talk to a dr. over the phone and does not want the RX.*"

153.    In April 2015, Mediverse funneled to FPS a TRICARE-covered prescription for S.M. signed by Dr. Sara Garcia. An FPS biller added the following notes about her conversation with the patient: "pt [patient] asked what was being sent, I told her some pain cream & solution for nail fungus. She said, *I have a million ppl [people] contacting me about stuff, I've already received stuff & sent it back. I don't want anything.*"

154.    In a separate April 2015 submission, Mediverse funneled to FPS a TRICARE-covered prescription for S.B.M. signed by Dr. Prashanth Rao. An FPS biller added the following notes about her conversation with the patient: "Called and spoke with patient – *she has no idea about any creams being ordered and someone must be ordering something under her name.*"

155.    Indeed, in the spring of 2015, several TRICARE beneficiaries specifically informed FPS that they believed the compounded prescriptions being prescribed and sent to them in the mail were "*a scam*."

156.    FPS and Mediverse, of course, ignored these red flags and continued to churn out as many TRICARE-covered prescriptions as possible, until TRICARE ultimately fixed its billing loophole.

### 3.    FPS/Kotchey

157.    As he entered prescription numbers into FPSTrack, McFarland also discovered dozens of TRICARE-covered prescriptions associated with Kotchey and her marketing company, Treasure Health.

158.    Like Mediverse and Wilkerson, Kotchey operated by identifying TRICARE beneficiaries and connecting them to doctors who would perform telemedicine consultations. Whereas Wilkerson used Karma Wellness Spa prescribers and Mediverse used 1stCareMD doctors, Kotchey used doctors from a telemedicine staffing company called Housecalls24/7.

159.    Like Mediverse, Kotchey targeted TRICARE beneficiaries.

160.    As noted above, Kotchey resides at 27 Ann St., Pittsburgh, Pennsylvania.

161.    In order to ensure that mail-order, TRICARE-covered prescriptions would not be rejected by TRICARE beneficiaries, Kotchey regularly requested that FPS ship prescriptions to her Pittsburgh residence.

162.    For example, as reflected in Exhibit G, prescription number 135087 was written for patient G.S. by Dr. William Clearfield in April 2015. At the top of the physical prescription, G.S.'s address is listed as 27 Ann Street in Pittsburgh (Kotchey's address). And, on the fax cover sheet, although the patient's billing address is listed as a location in Palmer, Alaska, the shipping address

was Kotchey's house. Further, adding insult to injury, although the prescription was from a Housecalls24/7 doctor, the fax was sent from Kotchey's fax machine to FPS.

163.     In the Order History field of the FPSTrack page, an FPS biller noted the following for the prescription: "Per rep[resentative] Mel[onie Kotchey] ***patient does not need to be contacted!*** Patient is aware of copy, delivery and address verified!"

164.     TRICARE reimbursed FPS $18,287.39 for this scar cream, which was sent directly to Kotchey.

165.     The G.S. prescription is not the only example of Kotchey shipping products to her home address.

166.     For example, notes reflected in the FPSTrack page for another Kotchey-associated, TRICARE-covered prescription reflects that FPS originally could not send a prescribed treatment to a patient located in North Carolina, one of the few states where FPS was not licensed to send its products. Three days later, an FPS biller updated the Order History tab to reflect her conversation with Kotchey: "Rep Melonie provided me with an alternate address to ship to for patient. Her friends address [in] . . . Pittsburgh, PA." In other words, to preserve her ability to collect a kickback from FPS, Kotchey arranged for the prescribed treatment to be shipped by FPS to a friend in Pittsburgh, instead of to the TRICARE beneficiary.

167.     Kotchey also duped TRICARE beneficiaries into attending telemedicine consultations by telling them they were participating in a medical survey or study. For example, one Kotchey-associated prescription, which TRICARE reimbursed for $16,410, contains the following note in the Order History field on FPSTrack: "called pt [patient] to get insurance info she asked if it was the survey she did over phone through her friend and will be free. . . . Called

Meloney [sic] . . . explained to her what was going on she will call her friend to see whats up she said she will email me back outcome."

168.     As described in more detail below, Kotchey received substantial and unlawful kickbacks for each of the TRICARE-covered prescriptions she funneled to FPS.

169.     In total, between September 2014 and August 2015, FPS paid Kotchey $794,650 in unlawful kickbacks tied to the TRICARE-covered prescriptions.

**E.     FPS Paid Massive Kickbacks to Wilkerson, Kotchey, and Mediverse**

170.     FPS's accounting records and financial reports show the flow of money from TRICARE to FPS, and ultimately on to Wilkerson, Kotchey, and Mediverse in the form of unlawful kickbacks.

### 1.     Audited Financials

171.     Before the proliferation of Defendants' kickback scheme targeting TRICARE beneficiaries, FPS's revenues were modest, and its sales were not concentrated on TRICARE beneficiaries.

172.     In 2013, for instance, FPS earned $4.3 million in total revenues and $900,000 in net profit. Only 15% of FPS's revenues were derived from TRICARE reimbursements.

173.     In 2014, TRICARE became FPS's largest customer, accounting for 38% of its total revenues. It was through the marketing efforts of Mediverse, Wilkerson, Kotchey, and other marketers that FPS's TRICARE concentration more than doubled in a single year.

174.     Based on these massive TRICARE reimbursements, FPS earned $20.6 million in revenues in 2014—***almost five times its 2013 revenues***. FPS, in turn, paid a total of $5.2 million in commissions to its sales force. As discussed in further detail below, the bulk of these commissions went to Mediverse, Wilkerson, and Kotchey in the form of unlawful kickbacks.

175.    After accounting for expenses, including the kickbacks, FPS earned a net profit of $7.5 million in 2014, and had $2.9 million in cash on-hand at the end of the year.

176.    FPS's total revenues—again, largely due to TRICARE reimbursements—continued to balloon in the first six months of 2015.

177.    FPS's 2015 audited financials, which only go through June 30, 2015, reflect that in the first six months of the year, FPS earned *$36 million in total revenues*. In other words, in only half of 2015, FPS earned 1.75 times the revenues that it earned in all of 2014 and over eight times the revenues that it earned in all of 2013.

178.    Almost all of FPS's 2015 revenues came via TRICARE reimbursements. FPS, in turn, paid $19.9 million in commissions to its salesforce during the first six months of the year. In other words, over half of FPS's total revenues during the first six months of 2015 were paid out as commissions. As discussed in further detail below, the bulk of these commissions went to Mediverse, Wilkerson, and Kotchey in the form of unlawful kickbacks.

179.    After accounting for expenses, including the kickbacks, FPS earned a net profit of $5.2 million through the end of June 2015, and had $8.6 million in cash on-hand as of that date.

### 2.    Internal Accounting Records

180.    FPS's internal accounting records provide a record of specific, unlawful kickbacks paid by FPS to Mediverse, Wilkerson, and Kotchey in exchange for funneling TRICARE-covered prescriptions to FPS.

181.    These records include the amount and date of the kickback, the entity that sent the kickback (FPS), the recipients of the kickback (Mediverse, Wilkerson, and Kotchey), and the bank account from which the kickback was sent (FPS's accounts at Wells Fargo and Bank of America).

182.   The Wells Fargo and Bank of America account numbers listed in the accounting records are the same accounts from which FPS paid McFarland during his employment with the company.

183.   Between November 7, 2014 and June 15, 2015, FPS made the following transfers totaling *$12.3 million* to Mediverse. FPS described the vast majority of these transfers as corresponding to "Commissions," with a few marked as related to "Accounts Payable."

- $108,225.73 on November 7, 2014, by check, from FPS's Bank of America account, reference number 1691.

- $10,000.00 on December 8, 2014, by check, from FPS's Wells Fargo checking account, reference number 7381.

- $30,000.00 on December 9, 2014, by check, from FPS's Wells Fargo checking account, reference number 7250.

- $409,834.55 on January 21, 2015, by check, from FPS's Wells Fargo checking account, reference number 7439.

- $118,740.92 on January 28, 2015, by check, from FPS's Bank of America account, reference number 1820.

- $185,110.01 on February 11, 2015, by check, from FPS's Bank of America account, reference number 1833.

- $409,834.55 on February 18, 2015, by check, from FPS's Wells Fargo checking account, reference number 7599.

- $206,458.12 on February 27, 2015, by check, from FPS's Bank of America account, reference number 1855.

- $20,000.00 on March 6, 2015, by check, from FPS's Wells Fargo checking account, reference number 7711.

- $132,208.03 on March 17, 2015, by check, from FPS's Wells Fargo checking account, reference number 7758.

- $383,783.65 on March 31, 2015, by check, from FPS's Bank of America account, reference number 1895.

- $30.00 on April 10, 2015, by ACH electronic payment, from FPS's Wells Fargo checking account.

- $10,000.00 on April 10, 2015, by check, from FPS's Wells Fargo checking account, reference number 7882.

- $504,214.98 on April 14, 2015, by check, from FPS's Wells Fargo checking account, reference number 7900.

- $600,000.00 on April 14, 2015, by electronic wire transfer, from FPS's Wells Fargo checking account.

- $30.00 on April 21, 2015, by ACH electronic payment, from FPS's Wells Fargo checking account.

- $1,000,000.00 on April 21, 2015, by electronic wire transfer, from FPS's Wells Fargo checking account.

- $400,000.00 on April 28, 2015, by check, from FPS's Bank of America account, reference number 1947.

- $200,000.00 on April 28, 2015, by check, from FPS's Wells Fargo checking account, reference number 7958.

- $400,000.00 on May 15, 2015, by electronic wire transfer, from FPS's Bank of America account.

- $200,000.00 on May 19, 2015, by electronic wire transfer, from FPS's Bank of America account.

- $48,716.33 on May 26, 2015, by check, from FPS's Bank of America account, reference number 1989.

- $1,001,210.56 on June 3, 2015, by check, from FPS's Bank of America account, reference number 2025.

- $500,000.00 on June 3, 2015, by check, from FPS's Bank of America account, reference number 2024.

- $500,000.00 on June 3, 2015, by check, from FPS's Bank of America account, reference number 2023.

- $4,940,136.53 on June 15, 2015, by electronic wire transfer, from FPS's Bank of America account.

184.    Each of these payments was a kickback to Mediverse for the funneling of TRICARE-covered prescriptions, and none were connected to billing work performed by Helix (a separate company also owned by Chris White, Mediverse's owner). Indeed, between January and June 2015, *FPS separately paid Helix another $1.7 million for its subcontracted billing services*. In other words, companies controlled by Chris White were receiving money in connection with both the marketing FPS's products (in the form of unlawful kickbacks to Mediverse) and billing TRICARE for those products (payments to Helix as FPS's billing subcontractor).

185.    Between September 11, 2014 and June 18, 2015, FPS made the following transfers totaling *3.5 million* to Wilkerson. FPS described each of these transfers as corresponding to "Commissions."

- $1,926.19 on September 11, 2014, by check, from FPS's Wells Fargo checking account, reference number 6754.

- $64,933.87 on September 26, 2014, by check, from FPS's Wells Fargo checking account, reference number 6834.

- $100,000.00 on September 30, 2014, by check, from FPS's Wells Fargo checking account, reference number 6863.

- $128,102.02 on October 10, 2014, by check, from FPS's Wells Fargo checking account, reference number 6921.

- $170,511.45 on October 29, 2014, by check, from FPS's Bank of America account, reference number 1685.

- $352,944.19 on November 4, 2014, by check, from FPS's Bank of America account, reference number 1688.

- $395,307.20 on December 2, 2014, by check, from FPS's Bank of America account, reference number 1736.

- $300,000.00 on December 2, 2014, by check, from FPS's Wells Fargo checking account, reference number 7197.

- $612,032.59 on December 29, 2014, by check, from FPS's Bank of America account, reference number 1777.

- $11.85 on January 9, 2015, by check, from FPS's Wells Fargo checking account, reference number 7411.

- $9,938.82 on January 14, 2015, by check, from FPS's Bank of America account, reference number 1796.

- $728,660.47 on January 28, 2015, by check, from FPS's Bank of America account, reference number 1819.

- $240,796.72 on February 25, 2015, by check, from FPS's Bank of America account, reference number 1850.

- $214,765.14 on March 27, 2015, by check, from FPS's Bank of America account, reference number 1893.

- $115,241.20 on April 27, 2015, by check, from FPS's Bank of America account, reference number 1982.

- $43,406.10 on June 1, 2015, by check, from FPS's Bank of America account, reference number 2017.

- $33,689.79 on June 18, 2015, by check, from FPS's Bank of America account, reference number 2059.

186.   Between September 26, 2014 and August 13, 2015, FPS made the following transfers totaling *$794,650* to Kotchey. FPS described each of these transfers as corresponding to "Commissions."

- $32,431.62 on September 26, 2014, by check, from FPS's Wells Fargo checking account, reference number 6837.

- $13,868.91 on September 26, 2014, by check, from FPS's Wells Fargo checking account, reference number 6836.

- $37,791.56 on October 10, 2014, by check, from FPS's Wells Fargo checking account, reference number 6917.

- $48,418.58 on October 28, 2014, by check, from FPS's Wells Fargo checking account, reference number 7047.

- $82,717.67 on November 13, 2014, by check, from FPS's Bank of America account, reference number 1705.

- $16,126.35 on November 25, 2014, by check, from FPS's Bank of America account, reference number 1724.

- $63,456.72 on December 11, 2014, by check, from FPS's Bank of America account, reference number 1753.

- $25,336.54 on December 29, 2014, by check, from FPS's Bank of America account, reference number 1772.

- $26,137.38 on January 14, 2015, by check, from FPS's Bank of America account, reference number 1794.

- $10,403.50 on January 28, 2015, by check, from FPS's Bank of America account, reference number 1811.

- $11,036.30 on February 11, 2015, by check, from FPS's Bank of America account, reference number 1828.

- $5,776.59 on February 25, 2015, by check, from FPS's Bank of America account, reference number 1843.

- $14,526.60 on March 10, 2015, by check, from FPS's Bank of America account, reference number 1866.

- $12,316.59 on March 27, 2015, by check, from FPS's Bank of America account, reference number 1883.

- $7,211.74 on April 15, 2015, by check, from FPS's Bank of America account, reference number 1907.

- $16,624.88 on April 27, 2015, by check, from FPS's Bank of America account, reference number 1938.

- $10,150.94 on May 15, 2015, by check, from FPS's Bank of America account, reference number 1967.

- $75,302.58 on June 1, 2015, by check, from FPS's Bank of America account, reference number 2013.

- $1,967.45 on June 9, 2015, by check, from FPS's Wells Fargo checking account, reference number 8115.

- $266,567.97 on June 12, 2015, by check, from FPS's Bank of America account, reference number 2045.

- $4,655.87 on June 30, 2015, by check, from FPS's Bank of America account, reference number 2123.

- $4,655.87 on July 13, 2015, by check, from FPS's Bank of America account, reference number 2120.

- $112.14 on July 29, 2015, by check, from FPS's Wells Fargo checking account, reference number 8192.

- $7,055.87 on August 13, 2015, by check, from FPS's Bank of America account, reference number 2208.

187.    Each of these commissions was an unlawful kickback paid in exchange for the funneling of TRICARE-covered prescriptions by Mediverse, Wilkerson, and Kotchey to FPS.

## CAUSE OF ACTION

**False or Fraudulent Claims via Kickbacks**
**Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**(Against FPS, Mediverse, Wilkerson, and Kotchey)**

*(Formerly Count III of the First Amended Complaint)*

188.    As a result of Defendants' knowing solicitation, receipt, offer, and/or acceptance of unlawful remuneration to induce patients to fill TRICARE-covered compounding pharmacy prescriptions at FPS in violation of the AKS, 42 U.S.C. § 1320a-7b(b), false and fraudulent claims for payment were made to TRICARE, a federal healthcare program.

189.    FPS presented these fraudulent claims to TRICARE, which reimbursed FPS. And, in violation of the AKS, FPS then paid kickbacks to Mediverse, Wilkerson, and Kotchey.

190.    Mediverse, Wilkerson, and Kotchey were independent contractors and were not bona fide employees of FPS, and therefore Defendants' conduct does not fit within the AKS's employee-services safe harbor.

191.    Through their violation of the AKS, Defendants knowingly caused to be presented materially false or fraudulent claims for payment or approval in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A).

192.    An FCA claim predicated on a violation of the AKS, such as the exchange of money between FPS and Mediverse, Kotchey, or Wilkerson, presumptively establishes an FCA violation, without any additional evidence of the materiality of the kickback to the Government's decision to make a payment.

193.    However, Defendants' compliance with the AKS was, in fact, material to TRICARE's decision to pay claims associated with prescriptions funneled to FPS by Mediverse, Kotchey, and Wilkerson. TRICARE would not have paid for prescriptions tainted by blatant and

unlawful kickbacks. Thus, had TRICARE known that prescriptions submitted for reimbursement by FPS were obtained in violation of the AKS by the Defendants', TRICARE would not have paid the reimbursements.

194.    By reason of the false or fraudulent claims, the United States has actual sustained damages in an amount to be determined at trial, for which Defendants are jointly and severally liable, and is entitled to treble damages, plus a civil penalty for each false or fraudulent claim.

## I.    <u>JURY TRIAL DEMAND</u>

195.    Mr. McFarland demands a trial by jury on all issues so triable.

## II.    <u>REQUEST FOR RELIEF</u>

**WHEREFORE**, Mr. McFarland respectfully requests that judgment be entered in favor of the United States of America and against Defendants for treble the damages to the United States, in an amount to be determined at trial, the maximum statutory penalty for each overpayment received in violation of the FCA, an award of costs, an award of attorneys' fees, an award of pre-judgment and post-judgment interest at the highest rates allowable by law, and such other relief the Court deems just and proper.

Dated: August 21, 2017

**REID COLLINS & TSAI LLP**

/s/ P. Jason Collins
P. Jason Collins (admitted *pro hac vice*)
Craig A. Boneau (admitted *pro hac vice*)
Ryan M. Goldstein (admitted *pro hac vice*)
**Reid Collins & Tsai LLP**
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
Telephone: 512.647.6100
Facsimile: 512.647.6129
jcollins@rctlegal.com
cboneau@rctlegal.com
rgoldstein@rctlegal.com

*Trial Counsel for Relator Brady McFarland*

**EWUSIAK LAW, P.A.**

/s/ Joel Ewusiak
**Joel Ewusiak**
Fla. Bar No.:   0509361
6601 Memorial Highway, Suite 311
Tampa, FL 33615
P:  727.286.3559
F:  727.286.3219
E:  joel@ewusiaklaw.com

*Local Counsel for Relator Brady McFarland*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that, on August 21, 2017, the foregoing document was filed using the CM/ECF system, which will send notice of electronic filing to all counsel of record. The foregoing documents has also been sent via U.S. Mail to the following *pro se* Defendants:

Marjorie Lantum
333 Cedarcreek Drive
Nashville, TN 37211

Ronald Lubetsky
1380 NE Miami Gardens Drive, Suite 280
North Miami Beach, FL 33179

Christian George Mayaud
92 Main Street #203
Yonkers, NY 10701

I FURTHER HEREBY CERTIFY that pursuant to Federal Rule of Civil Procedure 4, I will serve copies of this Second Amended Complaint, along with the Court's July 24, 2017 Order, on Defendants Florida Pharmacy Solutions and Wayne Wilkerson, who have not appeared in this action to date.

/s/ P. Jason Collins
**P. Jason Collins**